AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| LINDA LAREE NELSON and BRIEANN MCCLOSKEY, also known as BRIEANN ZANAZANIAN, | Case No. 2:24-MJ-02264-DUTY |
| Defendants | |

**FILED**
CLERK, U.S. DISTRICT COURT

4/17/24

CENTRAL DISTRICT OF CALIFORNIA
BY: jm DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

4/17/2024

CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 1, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1708 | Possession of stolen mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

U.S. Postal Inspector Gerardo Ramirez
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    4/17/2024

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jeremy K. Beecher (x5429)

## <u>AFFIDAVIT</u>

I, Gerardo Ramirez, being duly sworn, declare and state as follows:

### I.   <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint against, and the issuance of arrest warrants for, LINDA LAREE NELSON ("NELSON") and BRIEANN MCCLOSKEY, also known as BRIEANN ZANAZANIAN ("MCCLOSKEY"), for a violation of 18 U.S.C. § 1708 (Possession of Stolen Mail).

2.    This affidavit is also made in support of an application for a warrant to search five digital devices (the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service ("USPIS"), in Long Beach, California, as described more fully in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.   I am a Postal Inspector with the USPIS and have been so employed since February 2013.  I am currently assigned to the Long Beach Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of other persons' information for financial gain.  I completed a 12-week basic training course in Potomac, Maryland.  That course included training in the investigation of identity theft via the United States Mail. From my discussions with other Postal Inspectors, I have learned about mail theft investigations and common mail theft and identity theft practices.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.   On February 13, 2024, the Hermosa Beach Police Department ("HBPD") received a report from victim D.R. stating their identity was used without their authorization to purchase a Tesla Model 3 (the "black Tesla").  On February 20, 2024, HBPD Detective Sergeant Eric Cahalan applied for and was granted a

state search warrant to obtain the loan documents from Tesla. Tesla responded to the warrant and provided information related to the fraudulent purchase of the vehicle.

6. On March 1, 2024, law enforcement officers located the black Tesla in Sun Valley, California and saw a subject (later identified as NELSON) driving the vehicle. Investigators also saw NELSON unlocking and entering Unit xxx of an apartment building at xxxxx Allegheny Street (the "Subject Residence")[1]. HBPD officers detained NELSON when she returned to the black Tesla and found in her possession two Apple iPhones (SUBJECT DEVICES 1 and 2), and a counterfeit Tennessee driver license in the name of victim E.J. NELSON spontaneously stated she had borrowed her "buddy's" car and proceeded to name victim D.R. as her "buddy." After being Mirandized, NELSON stated she had been recently staying at the Subject Residence and is legally married to MCCLOSKEY. A record check revealed NELSON is currently on federal probation following a bank fraud conviction in this District.

7. MCCLOSKEY was contacted via cell phone and was observed by officers arriving at the location in a white Tesla Model 3 (the "white Tesla"), which was registered to victim B.K. When investigators asked MCCLOSKEY how she arrived at the location, she stated she was dropped off, although officers had observed her arriving by a car she drove. Sgt. Cahalan

---

[1] I am aware of the specific unit number and street address of the Subject Residence; however, due the anticipated public nature of this document, I am not including the specific numbers in this affidavit.

contacted B.K.'s spouse, who advised B.K. had not purchased a
Tesla and confirmed an unauthorized loan in the name of B.K. for
$48,652.  Tesla later provided an image of a counterfeit
California driver license with B.K.'s information and
MCCLOSKEY'S photo that was used to purchase the white Tesla.
MCCLOSKEY was detained pending an application for a search
warrant.

8.   Sgt. Cahalan applied for and was granted a search
warrant for the Subject Residence, the Tesla vehicles, and the
person of MCCLOSKEY by the Hon. Gia Bosley of the Superior Court
of the State of California, Los Angeles County.  Law enforcement
officers recovered from MCCLOSKEY's person an Apple iPhone
(SUBJECT DEVICE 3).  Law enforcement officers executed the
search warrant for the Subject Residence and found a large
quantity of mail and financial documents in names other than
NELSON and MCCLOSKEY, including a California driver license in
the name of victim D.R.

9.   During a search of the white Tesla, law enforcement
officers found genuine and counterfeit USPS keys, counterfeit
California driver licenses with MCCLOSKEY'S photo, an Apple
iPhone (SUBJECT DEVICE 4), and an Apple MacBook Pro (SUBJECT
DEVICE 5).

10.   During a Mirandized interview, MCCLOSKEY admitted to
purchasing the Tesla vehicles with others' identities and
stealing mail from USPS vehicles and other mail receptacles with
NELSON.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement reports,
conversations with other law enforcement officers, my personal
observations, and my own knowledge of the investigation, I am
aware of the following:

**A.   Fraudulent Purchase of the Black Tesla**

12.  According to my review of Hermosa Beach Police
Department reports, on February 13, 2024, HBPD received a report
from victim D.R. stating their identity had been used without
their authorization.  D.R. reported they had been reviewing
their credit report on February 12, 2024, when they noticed a
car loan that they had not actually applied for.  They contacted
the listed lender, Santander Consumer USA, and learned an
unknown subject had used their name and other identifying
information to purchase a Tesla Model 3.  I know that Santander
Consumer USA is an FDIC-insured financial institution.

13.  On February 14, 2024, Sgt. Cahalan spoke to D.R. and
learned the car loan amount was for over $50,000 and that it had
been submitted on January 14, 2024.  Sgt. Cahalan spoke to a
customer service representative of Santander Consumer USA, who
confirmed the loan had been made and that the vehicle acquired
with the loan was the black Tesla.  The representative confirmed
the loan was in the name and social security number of victim
D.R.

14.  In an effort to obtain the loan paperwork, associated
information related to the sale of the vehicle, email addresses,
phone numbers, identification cards, delivery/pick up location

and information related to the black Tesla, Sgt. Cahalan requested and was granted a search warrant for the information from Tesla on February 20, 2024, by the Hon. Laura Ellison of the Superior Court of the State of California, Los Angeles County.

15. Tesla produced information related to the fraudulent purchase of the vehicle, which included an email address of StillGameOver@iCloud.Com, and a phone number of ending in 2040. Sgt. Cahalan learned the vehicle was delivered to and picked up at the Tesla location at 1800 Spring St., Long Beach, CA.  The temporary CA license plate ended in -D08.

### B.  NELSON Arrested by HBPD Officers

16. On March 1, 2024, at approximately 4:50 a.m., law enforcement officers located the black Tesla parked on Allegheny Street near Telfair Avenue in Sun Valley, California.  At approximately 6:06 a.m., a female (later identified as NELSON) entered the black Tesla and drove to a McDonald's and a 7-11 near Telfair Avenue and Lankershim Blvd.  The female then returned to the area of the Subject Residence and parked the vehicle in the 9100 block of Telfair Ave.  At approximately 6:30 a.m. she walked to xxxxx Allegheny St., and I observed her unlock the door and enter the Subject Residence.

17. At approximately 7:15 a.m., the female returned to the black Tesla where she was detained by HBPD officers and positively identified as NELSON.  At the time of arrest, NELSON was in possession of a fraudulent Tennessee driver's license in the name of E.J.  NELSON stated it was a "play" license or

identification.  A record check revealed NELSON was on federal probation for a fraud-related case.  NELSON spontaneously stated, "If this has something to do with my car, I borrowed my buddy's car."  Sgt. Cahalan asked, "Who's your buddy?"  NELSON named the victim (victim D.R.).

18.  After being advised of her <u>Miranda</u> rights, NELSON told Sgt. Cahalan she knew the victim, whom she called "D***" (an abbreviation of D.R.'s first name)[2], and stated she had borrowed the car.  Sgt. Cahalan asked NELSON if they had a contract and if she was making payments.  NELSON said she was making payments for the vehicle.  NELSON knew the loan was issued by "Santander."  Sgt. Cahalan asked NELSON if she picked up the black Tesla in Long Beach and she told him she could not remember where, but that "he" (i.e. D.R.) got it, and she drove it back.  Sgt. Cahalan followed up again with victim D.R., who confirmed he does not know NELSON.

19.  NELSON stated she had only been recently staying at the Subject Residence.  NELSON stated that she is "legally" married to MCCLOSKEY.  Sgt. Cahalan asked NELSON how she knew "D***."  NELSON said they used to be neighbors.  NELSON said MCCLOSKEY was the lessor of the Subject Residence, that NELSON was not on the lease of the Subject Residence and that she would not consent to a search of the location, however, she possessed keys to the Subject Residence.

---

[2] I am aware of the nickname/abbreviation NELSON used; however, due to the anticipated public nature of this document, I am not including the reference to that abbreviation in its entirety here to protect the identity of victim D.R.

**C.    MCCLOSKEY Arrested by HBPD Officers**

20.    Law enforcement contacted MCCLOSKEY via cell phone.
MCCLOSKEY then arrived at the vicinity of the Subject Residence.
MCCLOSKEY arrived in a white 2023 Tesla Model 3, bearing
temporary plate ending in -899, with VIN# ending in -12256
(i.e., the white Tesla).  Law enforcement records showed the
white Tesla was registered to B.K. of Marina Del Rey,
California.  When asked how she had arrived at the location,
MCCLOSKEY lied to law enforcement officers and stated that she
had been dropped off.

21.    MCCLOSKEY confirmed she and NELSON are married and
have been together for five years.  MCCLOSKEY was detained
pending an application for a search warrant.

22.    On March 1, 2024, Sgt. Cahalan spoke to B.K.'s spouse,
B.F., via cell phone, who stated his wife had not purchased a
Tesla.  B.F. confirmed an unauthorized car loan in the amount of
$48,652 had been taken out from Santander Consumer USA in B.K.'s
name on January 9, 2024.

23.    Based on the information gathered during the
investigation, Sgt. Cahalan applied for and was granted a search
warrant for the Subject Residence by the Hon. Gia Bosley of the
Superior Court of the State of California, Los Angeles County.

24.    Upon searching MCCLOSKEY and her purse, Sgt. Cahalan
located a Tesla key card; a California ID in MCCLOSKEY's name
with the Allegheny address on it; and debit and California
benefits cards in the name Brieann ZANAZANIAN, which law
enforcement learned is an alias for MCCLOSKEY.

**D.   Search of Subject Residence**

25.   During the execution of the search warrant of the Subject Residence, law enforcement officers found a large quantity of mail and financial documents in names other than NELSON, MCCLOSKEY, or ZANAZANIAN (MCCLOSKEY's alias) throughout the Subject Residence.  These items were commingled with documents in the names of NELSON or MCCLOSKEY.  They included, but were not limited to:

a.   In the bedroom:

i.   In a cardboard box found on the floor: California driver licenses in the names of victims J.S., B.J., and J.M.; documents in the name of victim D.R.; 2023 IRS paperwork in the name of L.F.; and other documents and personal information in the names of individuals other than NELSON or MCCLOSKEY.

ii.   In an HH bag on the floor: an envelope in the name of victim L.F.; mail for Hermosa Beach residents A.P. and M.H.; mail and checks for various other residents in Redondo Beach; and financial documents, mail and checks in names of individuals other than NELSON or MCCLOSKEY.  The bag also contained a Chase Bank check in the name of ZANAZANIAN (MCCLOSKEY), mail for MCCLOSKEY, and a CitiBank check made payable to NELSON.

iii. On a nightstand: a California driver license for K.W.; a checkbook for Corner Greenfield, LLC.; and a California refund check for victim E.B.  The nightstand also had on it documents relating to NELSON and MCCLOSKEY/ZANAZANIAN.

iv.   In a small safe under the nightstand: an iPhone purchase order for L.J.; a Social Security card for victim E.J.; five California driver licenses and a bank card in names other than NELSON or MCCLOSKEY; a California driver license in the name of victim D.R.; and bank documents in the name of NELSON.

v.   In a Nike shoebox on the floor: a Global Entry card for J.L.; mail and documents for victim E.J.; checks and documents in names other than NELSON or MCCLOSKEY; checks made payable to NELSON; and a photocopy of MCCLOSKEY's California driver license.

vi.  In a duffel bag on the floor: a notebook with personal identifying information for subjects other than NELSON or MCCLOSKEY, including victim E.B.

b.   In the living room:

i.   In a file cabinet: treasury checks for victim E.B.; a visibly counterfeited check made payable to NELSON; mail in the name of victim D.R.; documents in the name of victim E.J.; and a Social Security card and Visa debit card in names other than NELSON or MCCLOSKEY.

c.   In the kitchen:

i.   In the trash bin:  Checks in the names of persons other than NELSON or MCCLOSKEY.

26.  Law enforcement subsequently contacted victim J.M., who is the spouse of victim B.J., regarding the California driver licenses found in their names.  J.M. stated that she and B.J. had been expecting the driver licenses to arrive by mail

around February 20, 2024, that they had not arrived, and that a
neighbor had informed them of a theft from a mail truck around
that date.  J.M. confirmed they did not give anyone else
permission to possess their California driver licenses and that
they do not know NELSON or MCCLOSKEY.

### E.   Search of the Tesla Vehicles

27.   Law enforcement officers searched the white Tesla.  In
it, they found evidence of mail theft and identity theft,
including: a counterfeit California driver license bearing
victim E.B.'s information and MCCLOSKEY's photo; a counterfeit
California driver license bearing A.H.'s information and
MCCLOSKEY's photo; four counterfeit USPS keys; and a genuine
USPS Arrow key.

28.   Law enforcement officers searched the black Tesla.
Inside it, they found a black backpack containing personal
information and identification belonging to NELSON.

### F.   USPIS Post-Arrest Interview of MCCLOSKEY and NELSON

29.   On March 4, 2024, Postal Inspectors Scott Robbins,
Lauren Ireland, and I interviewed MCCLOSKEY in the HBPD
conference room.  The interview was audio recorded.  I advised
MCCLOSKEY of her Miranda Rights.  MCCLOSKEY verbally
acknowledged she understood her rights and signed IS Form 1067
("USPIS Advice of Rights").

30.   MCCLOSKEY stated she did not remember who gave her the
information she needed to purchase a Tesla, but that she had the
information for a long time before making the purchase of the
vehicle.  MCCLOSKEY admitted to purchasing and picking up both

Tesla vehicles with NELSON, utilizing the Tesla mobile application on her cellphone to make the purchases. MCCLOSKEY stated that she and NELSON take turns driving the white and black Tesla cars.

31. MCCLOSKEY said she had successfully used the USPS mail keys found during execution of the search warrant to open USPS vehicles and steal mail. MCCLOSKEY admitted to using the postal keys to steal mail in Santa Monica, Orange County, Pasadena, Los Angeles, and possibly Hermosa Beach and Redondo Beach in February 2024. MCCLOSKEY stated the keys were used to open the back doors of USPS vehicles while they were parked in residential neighborhoods. After opening the rear doors, MCCLOSKEY would take the mail from the back of the trucks and put it in the backseat of the car that she and NELSON were driving. MCCLOSKEY stated that and NELSON would go out to steal mail in this manner together in the same vehicle.

32. MCCLOSKEY said she knows how to make counterfeit checks by either physically altering them or by making them online. MCCLOSKEY admitted to counterfeiting personal checks more frequently than business checks due to the enhanced security features found on business checks. MCCLOSKEY said she would deposit the checks herself as well as by using a third party to deposit them.

33. That day, the same group also conducted a <u>Mirandized</u> interview of NELSON. NELSON verbally acknowledged she understood her rights and signed IS Form 1067 ("USPIS Advice of Rights"). After being <u>Mirandized</u>, NELSON stated she had only

been recently staying at the Subject Residence and is legally married to MCCLOSKEY.  She then terminated questioning.

**G.    NELSON is On Federal Probation for Bank Fraud**

34.  According to my review of law enforcement records, NELSON is currently on Federal Probation stemming from a bank fraud conviction in this District for which she was sentenced to three years' probation on May 8, 2023.  (Case Number 2:19-cr-00790-PSG-AB.)

35.  In addition, I reviewed NELSON's criminal history and learned she has been convicted of crimes including the following:

        a.    On November 20, 2018:  Check forgery in violation of Cal. Penal Code §§ 473(a), 476, Superior Court for the State of California, County of Los Angeles, Case Number BURGA10457301;

        b.    On November 20, 2018:  Grand theft in violation of Cal. Penal Code § 487(a), Superior Court for the State of California, County of Los Angeles, Case Number GLNGA10456901;

        c.    On July 20, 2020:  Robbery in violation of Cal. Penal Code § 211, Superior Court for the State of California, County of Los Angeles, Case Number XNWLA09155201;

        d.    On May 22, 2019:  Receiving stolen property in violation of Cal. Penal Code § 496(a), Superior Court for the State of California, County of Los Angeles, Case Number LAX9AR3192401;

        e.    On August 29, 2019:  Unauthorized use of another person's personal identifying information in violation of Cal. Penal Code § 530.5(a), Superior Court for the State of

California, County of Los Angeles, Case Number XNWLA09092601;
and

f.   On February 5, 2021:  Grand theft in violation of
Cal. Penal Code § 487(a), Superior Court for the State of
California, County of Los Angeles, Case Number BURGA10919501.

### H.   MCCLOSKEY Has Numerous Prior Convictions for Identity Theft-related Offenses

36.   I reviewed MCCLOSKEY's criminal history and learned
she has been convicted of crimes including the following:

a.   On March 16, 2011:  Unauthorized use of another
person's personal identifying information in violation of Cal.
Penal Code § 530.5(a), Superior Court for the State of
California, County of Ventura, Case Number 2010026787;

b.   On January 14, 2015:  Five counts of acquisition
or possession of personal identifying information with intent to
defraud and a prior conviction, in violation of Cal. Penal Code
§ 530.5(c)(2) and two counts of burglary in violation of Cal.
Penal Code § 459, Superior Court for the State of California,
County of Ventura, Case Number 2014020207;

c.   On November 21, 2016:  Three counts of
unauthorized use of another person's personal identifying
information in violation of Cal. Penal Code § 530.5(a), and four
counts of possession of a driver's license for the purpose of
committing forgery in violation of California Penal Code
§ 470b, Superior Court for the State of California, County of
Los Angeles, Case Number GLNGA09083301;

14

      d.   On July 13, 2017:  Three counts of acquisition or possession of personal identifying information with intent to defraud and a prior conviction, in violation of Cal. Penal Code § 530.5(c)(2), Superior Court for the State of California, County of Los Angeles, Case Number XSWYA09581401;

      e.   On September 24, 2019:  Acquisition or possession of personal identifying information with intent to defraud and a prior conviction, in violation of Cal. Penal Code § 530.5(c)(2), Superior Court for the State of California, County of Los Angeles, Case Number XSONA11105901; and

      f.   On November 16, 2021:  Burglary in violation of Cal. Penal Code § 459, unauthorized use of another person's personal identifying information in violation of Cal. Penal Code § 530.5(a), and three counts of forging an official seal in violation of Cal. Penal Code § 472, Superior Court for the State of California, County of Los Angeles, Case Number BURGA09213901.

## V. <u>TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT</u>

37.  Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

      a.   People who steal mail are often involved in fraud and people who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often

retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.   It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

c.   Often times mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of

16

victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

e.  It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

f.  Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.  As used herein, the term "digital devices" includes the SUBJECT DEVICES.

39.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      e.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      f.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

42.   For all of the reasons described above, there is probable cause to believe that NELSON and MCCLOSKEY have violated 18 U.S.C. § 1708 (Possession of Stolen Mail).

43.   There is also probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Target Offenses will be found on the SUBJECT DEVICES, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 17th day of April, 2024.

HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE